**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**JACINTO MARTINEZ-BAUTISTA, et al.,**                                                              **PLAINTIFFS**

**v.**                           **CASE NO. 4:04-CV-710 GTE**

**D&S PRODUCE, ESTER DOOLITTLE
and EARLEE ARMSTRONG,**                                                                              **DEFENDANTS**

**<u>ORDER</u>**

Presently before the Court is the Motion for Summary Judgment filed by Plaintiffs against D&S Produce and Ester Doolittle. Also before the Court is the Motion for Default Judgment against Earlee Armstrong for Specific Damages.

**I. Background**

The parties submitted an Agreed Statement of Undisputed Facts (Dkt. #54) signed by counsel for the Plaintiffs and counsel for Defendants D&S Produce and Ester Doolittle. The Court accepts the facts stipulated to therein.

Defendant Ester Doolittle is an individual residing in Pine Bluff, Arkansas, and in 2002, he resided at 801 South Washington, Pine Bluff, AR 71601. Defendant D&S Produce LLC is a business entity, operated by Defendant Doolittle, with its principal place of business in Pine Bluff, Arkansas. On April 20, 1998, Defendant Ester Doolittle became the sole partner of Defendant D&S Produce LLC. On December 31, 1998, the Arkansas Secretary of State revoked the corporate charter for D&S Produce.

In 2002, AgWorks Inc. and Daniel Bremer, on behalf of D&S Produce and Earlee Armstrong Farm, submitted a joint application and clearance order ("Clearance Order") for

temporary labor certification to the United States Department of Labor seeking admission of thirty (30) H-2A workers[1] to be employed from May 27, 2002 until September 7, 2002. While AgWorks Inc. and Mr. Bremer assisted in preparing and submitting the Clearance Order and the application, neither advised Defendant Doolittle about the responsibilities of growers who applied jointly for temporary labor certification.

The Clearance Order offered, *inter alia*, transportation arrangements in compliance with the requirements of 20 C.F.R. § 655.102(b)(5), including an offer that after 50% of the employment period is complete, the employer will reimburse the reasonable cost of transportation to the job site. Defendant Doolittle signed the Clearance Order and initialed each page of the attachments to the Clearance Order with his initials "ED".

The Department of Labor approved the Clearance Order and certified the admission of 30 H-2A workers for employment with "D&S Produce and Earlee Armstrong Farm, jointly". Twenty-seven H2-A workers, including the Plaintiffs, were imported under the Clearance Order. The Clearance Order constituted the employment contract between the twenty-seven workers and their employers, containing all the terms and conditions of their employment. These twenty-seven workers entered the United States in two groups: one group of fourteen workers entered on July 9, 2002, and the Plaintiffs, the second group of thirteen workers, entered the United States

---

[1] As defined by 8 U.S.C. § 1188, "The term 'H-2A worker' means a nonimmigrant described in section 1101(a)(15)(H)(ii)(a) of this title."

8 U.S.C. § 1101(a)(15)(H)(ii)(a) states: "an alien . . . having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform agricultural labor or services, as defined by the Secretary of Labor in regulations and including agricultural labor defined in section 3121(g) of Title 26, agriculture as defined in section 203(f) of Title 29, and the pressing of apples for cider on a farm, of a temporary or seasonal nature".

on July 19, 2002.[2]

Plaintiffs Effias Hernandez-Ponce, Abundio Hernandez-Hernandez, Eugenio Hernandez-Salguero, Guadalupe Hernandez-Hernandez, Jose Felipe Hernandez-Hernandez, Leocadio Hernandez-Gonzalez, Pablo Hernandez-Hernandez, Fidel Martinez-Hernandez, Petronilo Oliveros-Trejo, Tomas Ponce-Alvarado, Jorge Rosales-Hernandez, and Sotero Santiago-Martinez each paid $151 in bus fare from central Mexico to Arkansas. Plaintiff Jacinto Martinez-Bautista paid $146 in bus fare from central Mexico to Arkansas. Each Plaintiff paid $171 in fees necessary to obtain and travel under an H-2A visa.

Upon arrival in Arkansas, each Plaintiff was presented with a copy of a booklet, in Spanish, entitled "D&S Produce y Earlee Armstrong Farm, juntos (el 27 de mayo hasta el 7 de septiembre 2002).[3] During their first week in Arkansas, each Plaintiff worked forty-one (41) hours and each Plaintiff was paid $250 in cash for this work. Over the second and third weeks of employment, each Plaintiff worked fifty-three (53) hours and were each paid $270 in cash. On August 13, 2002, Earlee Armstrong fired the Plaintiffs, telling them that he did not have any more work available. Each Plaintiff paid $163 in bus fare to return home from Pine Bluff, Arkansas.

Defendant Doolittle supervised, housed, and paid wages to the first group of fourteen workers, while Defendant Armstrong supervised, housed, and paid wages to the second group of thirteen workers. Defendant Doolittle did not own, control, or manage Plaintiffs' housing, supervise Plaintiffs' work, or pay wages to the Plaintiffs. Defendant Doolittle has no personal

---

[2] Defendant Doolittle requested 15 workers by July 9, 2002, and Defendant Armstrong requested 15 workers by July 19, 2002.

[3] The English translation of the title is "D&S Produce and Earlee Armstrong Farm, jointly (May 27, 2002 to September 7, 2002).

knowledge about any fees or expenses incurred by Plaintiffs relating to their employment under the Clearance Order or the reasons why Defendant Armstrong terminated the Plaintiffs' employment.[4]

## II. Summary Judgment Standard

Summary judgment is appropriate only when, in reviewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, so that the dispute may be decided solely on legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56. The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial-- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Eighth Circuit set out the burdens of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the party moving for summary judgment is only to demonstrate, i.e., '[to] point[] out to the District Court,' that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

---

[4] The Agreed Statement of Undisputed Facts states the termination date was August 13, 2005. It is clear from the pleadings and briefs of the parties that the actual date of termination was August 13, 2002, and the date contained in the Agreed Statement is a typographical error.

*Id*. at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988) (citations omitted)(brackets in original)).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id*.

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. Rule 56(e). The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

**III. Discussion**

Plaintiffs contend Defendant D&S Produce is jointly liable under the Clearance Order and that they are entitled to summary judgment because Defendant D&S Produce LLC and Defendant Earlee Armstrong: (i) breached the contract of employment by failing to pay each Plaintiff the guarantee of 3/4 work or wages, as well as the transportation and visa expenses; (ii) breached the contract of employment by failing to pay Plaintiffs the "adverse effect wage rate"

during their second and third weeks of employment; and (iii) violated the Fair Labor Standards Act by failing to pay each Plaintiff a wage at or above the minimum wage of $5.15 per hour. Defendants argue that they are not liable for any alleged damages because neither Defendant D&S Produce nor Defendant Doolittle was an employer of any Plaintiff.

### A.    *Breach of Contract*

The Court's first inquiry is whether either Defendant D&S Produce or Defendant Ester Doolittle is liable to the Plaintiffs under a contract of employment. The parties stipulated, in the Agreed Statement of Undisputed Facts, that "The 2002 Clearance Order constituted an employment contract between the twenty-seven H-2A workers and their employers, containing all the terms and conditions of the contract." (Dkt. #54, ¶ 14). However, Defendants now dispute this stipulation, suggesting that a work contract exists here only if "finalized" between the Plaintiffs and their "ultimate employer": "Defendant does dispute [t]he 2002 Clearance Order constituted an employment contract between the twenty-seven H-2A workers and their employers, containing all the terms and conditions of the contract; rather, the clearance order constitutes terms imputed into any contract finalized by prospective workers and his/her ultimate employer." (Defendant's Opposition to Plaintiffs' LR 56.1 Statement of Undisputed Material Facts and Defendant's Statement of Undisputed Material Facts, ¶ 23, Dkt. #67) (emphasis omitted).

#### 1.    *H-2A Program*

The H-2A program permits agricultural employers to satisfy an anticipated worker shortage by applying to the Office of Foreign Labor Certification ("OFLC") for a temporary alien

agricultural labor certification in order to hire non-immigrant aliens (H-2A workers).[5] The employer must certify to the OFLC that: "(a) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and (b) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1). The application for alien labor certification must identify the number of workers the employer needs, as well as the terms of the job offer. *See* 20 C.F.R. § 655.101(b)(1).

The employer, or an agent of the employer, must file the application with the OFLC Administrator and submit a copy of the application to the local office of the State Workforce Agency ("SWA"). The SWA prepares a local job order with the job offer portion of the application, and the employer must begin efforts to recruit local workers with the job order. The OFLCA Administrator checks the application for conformation with 20 C.F.R. §§ 655.101-103. Then, SWA prepares an agricultural clearance order to recruit U.S. workers on an intrastate and interstate basis. § 655.104(a). Once the OFLCA determines that the employer has satisfied the recruitment assurances, "the OFLC Administrator shall grant the temporary alien agricultural labor certification request for enough H-2A workers to fill the employer's job opportunities for which U.S. workers are not available." § 655.106(b)(1).

---

[5] "An employer who anticipates a shortage of U.S. workers needed to perform agricultural labor or services of a temporary or seasonal nature may apply to the OFLC Administrator for a temporary alien agricultural labor certification for temporary foreign workers (H-2A workers). A signed application for temporary alien agricultural worker certification shall be filed by the employer, or by an agent of the employer, with the OFLC Administrator. At the same time, a duplicate application shall be submitted to the local office serving the area of intended employment." 20 C.F.R. § 655.101(a)(1).

*2.     H-2A Work Contract*

The H-2A regulations expressly state that the employer and the recruited workers enter into a contract of employment:

> The employer shall provide to the worker, no later than on the day the work commences, a copy of the work contract between the employer and the worker. The work contract shall contain all of the provisions required by paragraphs (a) and (b) of this section. In the absence of a separate, written work contract entered into between the employer and the worker, the required terms of the job order and application for temporary alien agricultural labor certification shall be the work contract.

20 C.F.R. § 655.102(b)(14). Each Plaintiff was given a copy of a pamphlet entitled "D&S Produce y Earlee Armstrong Farm, juntos (el 27 de mayo 2002 hasta el 7 de septiembre 2002)"[6]. (Exh. C to Agreed Statement of Undisputed Facts, Dkt. #54). This pamphlet appears to be a compilation of the H-2A application, the 2002 Clearance Order, and Spanish translations of the Clearance Order attachments. (*Cf.* Application and Clearance Order, Exh. A to Agreed Statement of Undisputed Facts, Dkt. #54). Given the contents of the pamphlet, it appears that the requirements of § 655.102(b)(14) have been satisfied. However, Defendants argue that neither D&S Produce nor Ester Doolittle entered into a contract with Plaintiffs as their "employer".

There is no question that D&S Produce and Earlee Armstrong Farm applied for alien employment certification under the H-2A program as "D&S Produce and Earlee Armstrong Farm, jointly". Defendants assert that D&S Produce and Earlee Armstrong Farm were separately seeking fifteen H-2A workers, but filed a joint application only for convenience and upon advice of their agent, AgWorks, Inc., and not as joint employees or partners. Even if the Court accepts that Defendants intended to hire only fifteen H-2A workers, the Court cannot accept Defendants'

---

[6] The title of the pamphlet translates into English as: "D&S Produce and Earlee Armstrong Far, jointly (May 27, 2002 to September 7, 2002)".

- 8 -

argument.

The H-2A application requires an employer to sign a declaration as to the following:

> By virtue of my signature below, I HEREBY CERTIFY the following conditions of employment.
>
> a. I have enough funds available to pay the wage or salary offered the alien.
> b. The wage offered equals or exceeds the prevailing wage and I guarantee that, if a labor certification is granted, the wage paid to the alien when the alien begins work will equal or exceed the prevailing wage which is applicable at the time the alien begins work.
> c. The wage offered is not based on commissions, bonuses, or other incentives, unless I guarantee a wage paid on a weekly, bi-weekly, or monthly basis.
> d. I will be able to place the alien on the payroll on or before the date of the alien's proposed entrance into the United States.
> e. The job opportunity does not involve unlawful discrimination by race, creed, color, national origin, age, sex, religion, handicap, or citizenship.
> f. The job opportunity is not:
>    (1) Vacant because the former occupant is on strike or is being locked out in the course of a labor dispute involving a work stoppage.
>    (2) At issue in a labor dispute involving a work stoppage.
> g. The job opportunity's terms, conditions and occupational environment are not contrary to Federal, State or local law.
> h. The job opportunity has been and is clearly open to any qualified U.S. worker.

(Application for Alien Employment Certification, p.2, Exh. A to Dkt. #54). The application requested thirty H-2A workers. Contrary to Defendants' assertion, neither the H-2A application nor the 2002 Clearance Order indicate that D&S Produce requested fifteen workers as a separate group from the fifteen workers requested by Earlee Armstrong Farm, or that each grower intended to divide the requested thirty workers. As far as the documentation for the H-2A program reflect, "D&S Produce and Earlee Armstrong Farm, jointly" were certified, together, for thirty workers. By signing the application as Owner of D&S Produce, Ester Doolittle guaranteed

- 9 -

to the Department of Labor that an H-2A worker who begins work will be paid certain wages.

The 2002 Clearance Order also includes a certification by the employer: "Employer's Certification: This job order describes the actual terms and conditions of the employment being offered by me and contains all the material terms and conditions of the job." (Clearance Order, p. 2, Exh. A to Dkt. #54). The Clearance Order requested thirty individual workers for forty hours per week, and offered hourly wages of $6.69, and piece rates of $3.00 per 5 gallon bucket of okra and $2.00 per 5 gallon bucket of peas. (Id.).

Based upon the terms of the application and Clearance Order signed by Ester Doolittle, it appears that D&S Produce certified that it was requesting employment of thirty alien workers and offering the wages and job conditions set forth in the Clearance Order. After Plaintiffs received the pamphlet and began work, they entered into a work contract with "D&S Produce and Earlee Armstrong Farm, jointly".

Defendants argue that D&S Produce and Earlee Armstrong Farm did not enter into any agricultural venture jointly or hold themselves out as joint employers. The record suggests only the contrary. Defendants submitted their application to the H-2A program with "D&S Produce and Earlee Armstrong Farm, jointly" entered into the "Name of Employer" field. The address provided in the application is 810 S. Washington Street, Pine Bluff, Arkansas 71601, which is the address of Defendant Ester Doolittle's residence. The work pamphlet given to the H-2A workers and the agent agreement with AgWorks, Inc. both use the name D&S Produce and Earlee Armstrong, jointly. Finally, the Workers Compensation Application submitted for the period May 27, 2002 and May 27, 2003 for "VEG. GROWERS. COVERAGE FOR MIGRANT WORKERS FROM JUNE TO SEPT" lists Ester Doolittle as "Manager/Owner" and Earlee Armstrong as "Partner".

Defendants also refer to certain H-2A regulations that govern applications submitted by an association of agricultural producers. For example, Defendants assert that they are not joint employers with Earlee Armstrong Farm because associations are permitted to refer or transfer H-2A workers among member growers without being considered a joint employer of those workers. *See* 20 C.F.R. § 655.106(c)(2)(ii) (". . . any association shall be allowed to refer or transfer workers among its members (except as provided in paragraph (c)(2)(iii) of this section), and an association acting as an agent for its members shall not be considered a joint employer merely because of such referral or transfer."). The flaw with Defendants' argument here is that Defendants did not submit the H-2A application as an association, nor did Defendants make the required disclosures to the OFLC or submit the appropriate documentation.[7] Having failed to submit an application as an association, Defendants cannot now claim to have filed an H-2A application as an agricultural association and take advantage of the regulations applicable specifically to such entities.

Accordingly, the Court concludes that D&S Produce was an "employer" of the Plaintiffs with respect to the H-2A application, 2002 Clearance Order, and the resulting work contract.

### 3.   *Wage Guarantees*

The OFLC Administrator reviews an employer's H-2A application for compliance with the requirements of 20 C.F.R. § 655.102, which governs the contents of job offers. Section

---

[7] 20 C.F.R. § 655.101(a)(3) states: "Applications filed by associations. If an association of agricultural producers which uses agricultural labor or services files the application, the association shall identify whether it is: (i) The sole employer; (ii) a joint employer with its employer-member employers; or (iii) the agent of its employer-members. The association shall submit documentation sufficient to enable the OFLC Administrator to verify the employer or agency status of the association; and shall identify by name and address each member which will be an employer of H-2A workers."

655.102(b)(9) requires the employer to pay H-2A workers at least a certain amount in wages,[8] and § 655.102(b)(6)(i) requires the employer to guarantee at least three-fourths of the contract hours.[9]

The job offer and work contract sets forth the following wages: hourly wages of $6.69; piece rate of $3.00 per 5 gallon bucket of okra; and piece rate of $2.00 per 5 gallon bucket of peas. (Clearance Order, p. 2, Exh. A to Dkt. #54). These offered wages were accepted by the OFLC Administrator as compliant with the § 655.102(b)(9), and the Court agrees.

The Clearance Order offered forty hours of work per week for the period of seven weeks from July 18, 2002 to September 7, 2002. The three-fourths clause guaranteed the Plaintiffs three-quarters of the contract hours, or 210 hours. The Plaintiffs worked a total of ninety-four hours before their employment was terminated. As the Plaintiffs were offered fewer than three-fourths of the guaranteed employment, they are entitled to payment of wages equal to the amount

---

[8] 20 C.F.R. § 655.102(b)(9) provides, in pertinent part:
"(i) If the worker will be paid by the hour, the employer shall pay the worker at least the adverse effect wage rate in effect at the time the work is performed, the prevailing hourly wage rate, or the legal federal or State minimum wage rate, whichever is highest, for every hour or portion thereof worked during a pay period; or
(ii)(A) If the worker will be paid on a piece rate basis and the piece rate does not result at the end of the pay period in average hourly piece rate earnings during the pay period at least equal to the amount the worker would have earned had the worker been paid at the appropriate hourly rate, the worker's pay shall be supplemented at that time so that the worker's earnings are at least as much as the worker would have earned during the pay period if the worker had been paid at the appropriate hourly wage rate for each hour worked; and the piece rate shall be no less than the piece rate prevailing for the activity in the area of intended employment . . ."

[9] 20 C.F.R. § 655.101(b)(6)(i) provides: "The employer shall guarantee to offer the worker employment for at least three-fourths of the workdays of the total periods during which the work contract and all extensions thereof are in effect, beginning with the first workday after the arrival of the worker at the place of employment and ending on the expiration date specified in the work contract or in its extensions, if any. If the employer affords the U.S. or H-2A worker during the total work contract period less employment than that required under this paragraph (b)(6), the employer shall pay such worker the amount which the worker would have earned had the worker, in fact, worked for the guaranteed number of days".

- 12 -

they would have earned had they worked the 210 guaranteed number of days. The appropriate hourly wage here is $6.69. The total amount Plaintiff would have earned is $1404.90. As Plaintiffs were paid in cash a total amount of $520, each Plaintiff is entitled to a sum of $884.90.

Plaintiffs also seek reimbursement of travel and visa fees incurred in connection with their H-2A employment with Defendants. Plaintiffs are not entitled to such reimbursements. The work contract provides for reimbursement of the reasonable cost of transportation and subsistence from the place of recruitment to the grower's location only upon completion of fifty percent of the employment period. The Plaintiffs did not complete fifty percent of the employment period, so they are not entitled to any reimbursement of transportation fees. And as the work contract contains no provisions for the reimbursement of visa fees, the Court cannot award any under the contract.

**B. Fair Labor Standards Act**

"The principal congressional purpose in enacting the Fair Labor Standards Act of 1938 was to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'" *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 739, 101 S.Ct. 1437, 1444 (1981) (*quoting* 29 U.S.C. § 202(a)). The Fair Labor Standards Act ("FLSA") requires employers pay a minimum wage of $5.15 per hour for work performed after September 1, 1997. 29 U.S.C.A. § 206(a)(1).

The wages paid to an employee must meet the following standard under the FLSA: "Whether in cash or in facilities, 'wages' cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or 'free and clear.'

The wage requirements of the Act will not be met where the employee 'kicks-back' directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee." 29 C.F.R. § 531.35. In interpreting this regulation, courts have held that the minimum wage requirement is not met if the employee incurs pre-employment expenses, primarily for the benefit of the employer, which reduces the wages for the first workweek below the minimum wage rate. *See*, *e.g.*, *Arriaga v. Florida Pacific Farms, L.L.C.*, 305 F.3d 1228, 1237 (11th Cir. 2002) ("Workers must be reimbursed during the first workweek for pre-employment expenses which primarily benefit the employer, to the point that wages are at least equivalent to the minimum wage.").

The Eleventh Circuit Court recently held that a one-time transportation expense for an H-2A worker was primarily for the benefit of the employer. *Arriaga*, 305 F.3d at 1242. The rationale is that a one-time transportation cost and the visa fees are the inevitable consequence of participating in the H-2A program to employ non-immigrant alien workers. *Id*. These costs are distinguished from those expenses arising from an everyday commute or other expenses arising from every day living, which would not be "primarily for the benefit of the employer." The Court finds this reasoning persuasive and concludes that each Plaintiff may be reimbursed for the individual bus fares and the H-2A visa fees paid, to the extent that such fares and fees reduced the first workweek's pay below the minimum wage of $5.15.

Calculating the first workweek's pay, at a rate of $5.15 per hour for forty-one hours, the minimum amount that each Plaintiff should have received is $211.15. Plaintiff Jacinto Martinez-Bautista paid $146 in bus transportation from Mexico to Pine Bluff, Arkansas and another $165 in visa fees, for a total of $311. The remaining Plaintiffs paid $151 in bus transportation and

$165 in visa fees, for a total of $316.[10] As these pre-employment expenses exceed the total amount paid to each Plaintiff for the first workweek, Plaintiffs did not receive the FLSA mandated minimum wage. The amounts owed to the Plaintiffs to bring their first week's wages up to the minimum wage is as follows: (i) $272.15 for Plaintiff Martinez-Bautista; and (ii) $277.15 to the remaining Plaintiffs.

Pursuant to 29 U.S.C.A. § 216(b), "Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." As Defendants violated the minimum wage provisions of 29 U.S.C.A. § 206(a)(1), each Plaintiff is entitled to liquidated damages. Accordingly, the total amount owed to the Plaintiffs, under the FLSA, are as follows: (i) to Plaintiff Martinez-Bautista, $544.30; and (ii) to the remaining Plaintiffs, $554.30.

The Court concludes that the judgment shall be entered in favor of Plaintiff Martinez Bautista for $884.90 in unpaid wages, plus $544.30 in damages under the FLSA, for a total judgment amount of $1429.20. The Court concludes that judgment shall be entered in favor of Plaintiffs Effias Hernandez-Ponce, Abundio Hernandez-Hernandez, Eugenio Hernandez-Salguero, Guadalupe Hernandez-Hernandez, Jose Felipe Hernandez-Hernandez, Leocadio Hernandez-Gonzalez, Pablo Hernandez-Hernandez, Fidel Martinez-Hernandez, Petronilo Oliveros-Trejo, Tomas Ponce-Alvarado, Jorge Rosales-Hernandez, and Sotero Santiago-Martinez for $884.90 in unpaid wages, plus $554.30 in damages under the FLSA, for a total

---

[10] Plaintiffs also seek reimbursement of the hotel costs incurred in the course of obtaining their visas. The Court declines to hold that the cost of the hotel stay was primarily for the benefit of the employer, and an expense to be factored into the determination of the minimum wage compliance with the FLSA.

judgment amount of $1439.20.

**C. Motion for Default Judgment Against Earlee Armstrong**

The Court entered default judgment against Earlee Armstrong on October 6, 2005. A party entitled to default judgment is required to prove the amount of damages to be awarded, and the Plaintiffs have done so.

For the reasons set forth herein, the Court concludes that judgment shall be entered against Earlee Armstrong and in favor of Plaintiff Martinez Bautista for $1429.20, and in favor of Plaintiffs Effias Hernandez-Ponce, Abundio Hernandez-Hernandez, Eugenio Hernandez-Salguero, Guadalupe Hernandez-Hernandez, Jose Felipe Hernandez-Hernandez, Leocadio Hernandez-Gonzalez, Pablo Hernandez-Hernandez, Fidel Martinez-Hernandez, Petronilo Oliveros-Trejo, Tomas Ponce-Alvarado, Jorge Rosales-Hernandez, and Sotero Santiago-Martinez each for $1439.20.

IT IS THEREFORE ORDERED that the Plaintiffs' Motion for Summary Judgment (Dkt. #50) be, and it is hereby, GRANTED.

IT IS FURTHER ORDERED that the Plaintiff's Motion for Entry of Judgment of Specific Damages against Earlee Armstrong (Dkt. #55) be, and it is hereby, GRANTED.

Dated this 25th day of August, 2006.

                                       __/s/ Garnett Thomas Eisele____
                                       UNITED STATES DISTRICT JUDGE